AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

## WESTERN DISTRICT OF WASHINGTON

In the Matter of the Search of

(Name, address or brief description of person, property, or premises to be searched)
See Attachment A, which is attached hereto and
and incorporated herein by reference

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

CASE NUMBER: 05-5032 M.

FEB 22 2005

WESTERN DISTRICT OF WASHINGTON AT TACOMA

I, ROBERT J. ALLEN, being duly sworn depose and say:

I am a Special Agent, Drug Enforcement Administration, and have reason to believe that ( ) on the person of or (X) on the property known as (name, description and/or location)

See Attachment A, which is attached hereto and incorporated herein by reference

in the Western District of Washington, there is now concealed a certain person or property, namely:
(describe the person or property to be seized)

See Attachment B, which is attached hereto and incorporated herein by reference

which is (state one or more basis for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

concerning a violation of Title 21 United States Code, Section(s) 841(a)(1), 843(b), 846, and 856. The facts to support a finding of Probable Cause are as follows:

See attached AFFIDAVIT OF ROBERT J. ALLEN, attached hereto and incorporated herein by reference

Continued on the attached sheet and made a part hereof.    (X) Yes    ( ) No

Signature of Affiant
ROBERT J. ALLEN, Special Agent, DEA

Sworn to before me, and subscribed in my presence:

February 17, 2005                           at    Vancouver, Washington
Date                                              City and State

GILBERT KLEWENO
United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

05-MJ-05032-APP

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

**1.   1055 CLOVERDALE ROAD, KALAMA, WASHINGTON**

1055 CLOVERDALE ROAD, KALAMA, WASHINGTON is described as a
residential two story, wood framed, dwelling, brown in color,
with white trim.  The dwelling is located on a multi acre parcel
of property, west of Cloverdale Road and is accessed by a dirt
road.   The property contains one large outbuilding/pole
barn/garage south and east of the residence that is gray in
color with a tin roof and is further referenced by attached
photograph.



**2.   THREE OUTBUILDINGS LOCATED ON THE REAL PROPERTY AT 129
       VINCENT ROAD, KALAMA, WASHINGTON**

THREE OUTBUILDINGS LOCATED ON THE REAL PROPERTY AT 129 VINCENT
ROAD, KALAMA, WASHINGTON are described three outbuildings
located in close proximity to each other and are further
described as: 1) the northern most outbuilding is blue metal
building with a white roof and no windows; 2) the second
outbuilding is gray/white in color with a white roof, the front
door is red and no windows; 3) the third outbuilding is a small
brown wooden building with a tin roof and no windows.  All three
out buildings are located south of Vincent Road, east of a
private easement road which accesses several other private
parcels and residences.  The front doors to all three

outbuildings face west and are further referenced by attached photograph.



3.    1979 Red Chevrolet Pickup, Washington License A56020E, VIN/CCD146J152903 further described by attached photographs.





4.    1990 Yellow Ford Van/Truck, Washington License A21529E, VIN/1FDKE37G5LHB21297



2

## ATTACHMENT B

The following records, documents, and other items, in whatever form, that constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856:

(a)     Controlled substance ledgers, or money ledgers, controlled substance distribution lists or customer lists, controlled substance supplier lists, correspondence, notations, logs, receipts, journals, books, ledgers or other documents noting the price, quantity and/or times when controlled substances were obtained, transferred, sold, distributed and/or concealed;

(b)     Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, bank records, wire transfer receipts and illegal activities of associates in drug trafficking activities;

(c)     Indicia of occupancy, residency or ownership of the premises and things described in this warrant, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements and escrow documents;

(d)     Records, items and documents reflecting travel for the purpose of participation in controlled substance trafficking including passports, airline tickets, credit card receipts, travel vouchers, motel/hotel receipts, rental car receipts and documentation, wire transfer receipts, maps and written directions to locations;

(e)     Financial/Drug records, including but not limited to, books, records and documents used, intended for use, or concerning manufacturing and distribution of methamphetamine, and association with others involved in the manufacturing and distribution of methamphetamine, or facilitation of the transportation, sale, receipt, possession of concealment of methamphetamine, to include, but not limited to writings, photographs, calendars, "Things to do" schedules, and similar items;

(f)     Hand written notes concerning prices, quantities, sales, loans, "pay and owe" records indicating sales and balances owed for methamphetamine sales, or any other account books, ledgers and notes relating to above individuals drug trafficking activities, in any form; typed instructions regarding any of the above; encoded and/or cryptic information whether in writing or contained within pagers, cellular telephones,

ATTACHMENT B -1

computers/computer tapes and disks, together with hardware and software, instruction manuals to allow interpretation and retrieval of information stored therein, as well as the computer themselves, word processors or similar equipment containing information concerning methamphetamine distribution, or association with those involved in methamphetamine distribution, to include computers, floppy disks, back up disks, software instruction, and the computers, word processors or other similar equipment itself, together with any software used to operate said equipment;

(g)     Correspondence and envelopes, personal telephone and address books, together with telephone toll records, travel records, receipts, airline tickets, and auto rental agreements, invoices and other memorandum disclosing acquisition of assets, both personal and business in nature, retained copies of financial statements, loan records, mortgages, deeds, titles, certificates of ownership and registration documents, state and federal income tax returns, both individual and corporate; any stored information contained on any telephone answering machine/tape(s)pertaining to any of the above, as well as documentary evidence indicating past, present, or intended possession of methamphetamine or any equipment described in this exhibit;

(h)     Storage locker contracts, keys, codes, and associated documentation; together with any other evidence of narcotics profits and/or proceeds, and items purchased with proceeds, such as U.S. currency, coins, gems, financial and negotiable instruments, securities, precious metals, jewelry, vehicle registration receipts; as well as other items of identification such as vehicle registrations, vehicle titles, driver licenses, letters, bills, receipts, fingerprints, property titles, records relating to obtaining, transferring, secreting or spending money to include bank account records, including checking, savings, and investments accounts, safe deposit box keys and rental applications and signature cards, stocks, bonds, financial accounts, airline tickets, boats, vehicles and other items of value as well as evidence regarding the concealment of the source and ownership of such cash, proceeds and items of value by use of false names, aliases, postal box addresses, addresses of relatives and acquaintances, corporations and other devices as well as records, receipts, notes, identification documents and other papers indicating that the persons named above are presently using aliases or assumed names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities;

(i)     Scales, cutting materials, baggies, and other packaging materials; and

(j)     Large quantities of cash.

ATTACHMENT B -2

1 **AFFIDAVIT**

2

3 STATE OF WASHINGTON   )
            )   ss
 COUNTY OF KING     )

4

5 I, ROBERT J. ALLEN, being first duly sworn, state as follows:

6   1.  I am an investigative law enforcement officer of the United States within

7 the meaning of Title 18, United States Code, Section, 2510(7), who is empowered by

8 law to conduct investigations of, and to make arrests for, offenses enumerated in Title

9 18, United States Code, Section 2516.

10   2.  I am employed as a Special Agent ("S/A") with the Drug Enforcement

11 Administration ("DEA"), and have been so employed since 1998. I am currently

12 assigned to the DEA Salem Office, in Salem, Oregon and have been for the past two

13 years. Before my assignment to the DEA Salem Office, I was assigned to the DEA

14 Regional Enforcement Team in Des Moines, Iowa for three years. Before my

15 assignment to RET, I was assigned to DEA office in McAllen, Texas for approximately

16 two years. In connection with my official DEA duties, I investigate criminal violations

17 of the federal controlled substance laws. I have received special training in the

18 enforcement of laws concerning controlled substances as found in Title 21 of the United

19 States Code. I have attended the FBI/DEA Training Academy in Quantico, Virginia

20 for a sixteen-week training in investigative law enforcement, including investigation

21 and enforcement of controlled substance offenses. I have received in excess of one

22 hundred hours of training in the use and identification of controlled substances and in

23 the investigation of controlled substance crimes in additional in-service courses. In

24 2004, I attended a one-week clandestine laboratory school taught by DEA at Quantico,

25 Virginia and I personally produced methamphetamine using the red phosphorus

26 production method. I am certified to assist in clean-up and investigation of clandestine

27 methamphetamine production laboratories. I have assisted in the investigation and

28 clean up of at least five clandestine methamphetamine laboratories. I have been the

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 1

1  lead investigator in more than fifty felony drug cases.  I am familiar with how drugs
2  are packaged, transported, manufactured and sold, and how some drug trafficking
3  organizations operate.

4      3.        I have testified in judicial proceedings concerning violations of the
5  controlled substance laws.  I have been involved in various types of electronic
6  surveillance, and in the debriefing of defendants, witnesses and informants, as well as
7  others who have knowledge of the distribution and transportation of controlled
8  substances, and of the laundering and concealing of proceeds from controlled substance
9  trafficking.  I have applied for, executed and assisted with more than 100 search
10  warrants on narcotic related investigations.

11      4.    I have received training in investigations involving the interception of
12  wire and oral communications.  I am familiar with the ways in which controlled
13  substance traffickers conduct their business, including, but not limited to, their methods
14  of importing and distributing controlled substances, their use of telephones and digital
15  display paging devices, and their use of numeric codes and code words to conduct their
16  transactions.

17      5.    As part of my investigation in this case, I have consulted with DEA Task
18  Force Agent ("TFA") Len Braithwait and Portland Police Bureau ("PPB") Investigator
19  Justin Faw, in regards to facts and probable cause, and I have been involved in the
20  investigation of CAULFIELD since July, 2003.  TFA Braithwait has been involved in
21  this investigation since December, 1999.

22      6.    This affidavit is submitted in support of an Application for a Search
23  Warrant to search the structures located at the following addresses, as more specifically
24  described in Attachment A, which I believe are being used to conceal certain articles
25  described within this affidavit, which may be instrumentalities, fruits, and evidence of
26  violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856:

27      a.    1055 Cloverdale Road, Kalama, Washington; and

28      b.    129 Vincent Road, Kalama, Washington.

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 2

7.      This affidavit also is submitted in support of that same Application for a Search Warrant to search the following vehicles, as more specifically described in Attachment A, which I believe are being used to conceal certain articles described within this affidavit, which may be instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856:

a.      1979 Red Chevrolet Pickup, Washington License A56020E, VIN/CCD146J152903; and

b.      1990 Yellow Ford Van/Truck, Washington License A21529E, VIN/1FDKE37G5LHB21297.

8.      The items that are the subject of the search and seizure applied for in this affidavit are as follows, as more specifically described in Attachment B, which is attached hereto and incorporated herein by reference:

a.      Controlled substance ledgers, or money ledgers, controlled substance distribution lists or customer lists, controlled substance supplier lists, correspondence, notations, logs, receipts, journals, books, ledgers or other documents noting the price, quantity and/or times when controlled substances were obtained, transferred, sold, distributed and/or concealed;

b.      Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, bank records, wire transfer receipts and illegal activities of associates in drug trafficking activities;

c.      Indicia of occupancy, residency or ownership of the premises and things described in this warrant, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements and escrow documents;

d.      Records, items and documents reflecting travel for the purpose of participation in controlled substance trafficking including passports, airline tickets, credit card receipts, travel vouchers, motel/hotel receipts, rental car receipts and

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 3

1  documentation, wire transfer receipts, maps and written directions to locations;

2          e.     Financial/Drug records, including but not limited to, books,

3  records and documents used, intended for use, or concerning manufacturing and

4  distribution of methamphetamine, and association with others involved in the

5  manufacturing and distribution of methamphetamine, or facilitation of the

6  transportation, sale, receipt, possession of concealment of methamphetamine, to

7  include, but not limited to writings, photographs, calendars, "Things to do" schedules,

8  and similar items;

9          f.     Handwritten notes concerning prices, quantities, sales, loans, "pay

10  and owe" records indicating sales and balances owed for methamphetamine sales, or

11  any other account books, ledgers and notes relating to above individuals drug

12  trafficking activities, in any form; typed instructions regarding any of the above;

13  encoded and/or cryptic information whether in writing or contained within pagers,

14  cellular telephones, computers/computer tapes and disks, together with hardware and

15  software, instruction manuals to allow interpretation and retrieval of information stored

16  therein, as well as the computer themselves, word processors or similar equipment

17  containing information concerning methamphetamine distribution, or association with

18  those involved in methamphetamine distribution, to include computers, floppy disks,

19  back up disks, software instruction, and the computers, word processors or other

20  similar equipment itself, together with any software used to operate said equipment;

21          g.     Correspondence and envelopes, personal telephone and address

22  books, together with telephone toll records, travel records, receipts, airline tickets, and

23  auto rental agreements, invoices and other memorandum disclosing acquisition of

24  assets, both personal and business in nature, retained copies of financial statements,

25  loan records, mortgages, deeds, titles, certificates of ownership and registration

26  documents, state and federal income tax returns, both individual and corporate; any

27  stored information contained on any telephone answering machine/tape(s)pertaining to

28  any of the above, as well as documentary evidence indicating past, present, or intended

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 4

1  possession of methamphetamine or any equipment described in this exhibit;

2        h.    Storage locker contracts, keys, codes, and associated

3  documentation; together with any other evidence of narcotics profits and/or proceeds,

4  and items purchased with proceeds, such as U.S. currency, coins, gems, financial and

5  negotiable instruments, securities, precious metals, jewelry, vehicle registration

6  receipts; as well as other items of identification such as vehicle registrations, vehicle

7  titles, driver licenses, letters, bills, receipts, fingerprints, property titles, records

8  relating to obtaining, transferring, secreting or spending money to include bank account

9  records, including checking, savings, and investments accounts, safe deposit box keys

10 and rental applications and signature cards, stocks, bonds, financial accounts, airline

11 tickets, boats, vehicles and other items of value as well as evidence regarding the

12 concealment of the source and ownership of such cash, proceeds and items of value by

13 use of false names, aliases, postal box addresses, addresses of relatives and

14 acquaintances, corporations and other devices as well as records, receipts, notes,

15 identification documents and other papers indicating that the persons named above are

16 presently using aliases or assumed names in order to hide and conceal themselves from

17 law enforcement authorities to disguise their current activities;

18       i.    Scales, cutting materials, baggies, and other packaging materials;

19 and

20       j.    Large quantities of cash.

21    9.    The locations to be searched are as follows, as more specifically described

22 in Attachment A, which is attached hereto and incorporated herein by reference:

23       a.    1055 Cloverdale Road, Kalama, Washington, and is further

24 described as a residential two story, wood framed, dwelling, brown in color, with

25 white trim.  The dwelling is located on a multi acre parcel of property, west of

26 Cloverdale Road and is accessed by a dirt road.   The property contains one large

27 outbuilding/pole barn/garage south and east of the residence that is gray in color with a

28 tin roof; and

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 5

1           b.      129 Vincent Road, Kalama, Washington, and is further described

2 as are described three outbuildings located in close proximity to each other and are

3 further described as:  (1) the northern most outbuilding is blue metal building with a

4 white roof and no windows; (2) the second outbuilding is gray/white in color with a

5 white roof, the front door is red and no windows; (3) the third outbuilding is a small

6 brown wooden building with a tin roof and no windows.  All three out buildings are

7 located south of Vincent Road, east of a private easement road which accesses several

8 other private parcels and residences.  The front doors to all three outbuildings face

9 west.

10      10.    The vehicles to be searched are as follows, as more specifically described

11 in Attachment A, which is attached hereto and incorporated herein by reference:

12           a.      1979 Red Chevrolet Pickup, Washington License A56020E,

13 VIN/CCD146J152903.  The registered owner of this vehicle is Lanny R. Moore, 13904

14 NE 64th Circle, Vancouver, Washington; and

15           b.      1990 Yellow Ford Van/Truck, Washington License A21529E,

16 VIN/1FDKE37G5LHB21297.  The registered owner of this vehicle is ROBERT JOHN

17 CAULFIELD'S wife, Cindy Lou Rasmussen, 3609 Old Pacific Highway #5, Kelso,

18 Washington.

19      11.    I have personally participated in this investigation and am familiar with

20 the information contained in this affidavit.  The following information is derived from

21 my personal observation, surveillance, interviews and my review of physical evidence,

22 as well as my review of reports generated by law enforcement officials, and discussions

23 with other narcotics investigators who have personal knowledge of the matters covered

24 in those reports and discussions, and from conversations with persons who have

25 personal knowledge of the events described herein.  Because this affidavit is being

26 submitted for the limited purpose of securing a search warrant, I have not included each

27 and every fact known to me concerning this investigation.  I have set forth only the

28 facts that I believe are necessary to establish probable cause to believe that evidence of

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 6

700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

1   violations of Title 21, United States Code, Sections 841(a)(1)  (manufacture,

2   distribution and possession with the intent to distribute of a controlled substance),

3   843(b) (use of communication facility), 846 (attempt and conspiracy), and 856

4   (maintaining drug-involved premises) is located at the above addresses.

5                              **RELEVANT FEDERAL STATUTES**

6          12.    Title 21, United States Code, Section 841(a)(1) makes it unlawful for

7   "any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or

8   possess with intent to manufacture, distribute, or dispense, a controlled

9   substance . . . ."

10         13.    Title 21, United States Code, Section 843(b), makes it unlawful "for any

11  person knowingly or intentionally to use any communication facility in committing or in

12  causing or facilitating the commission of any act or acts constituting a [narcotics-

13  related] felony . . . ."

14         14.    Title 21, United States Code, Section 846, provides that "[a]ny person

15  who attempts or conspires to commit any offense defined in this subchapter shall be

16  subject to the same penalties as those prescribed for the offense, the commission of

17  which was the object of the attempt or conspiracy."

18         15.    Title 21, United States Code, Section 856, makes it unlawful to "(1)

19  knowingly open, lease, rent, use, or maintain any place . . . for the purpose of

20  manufacturing, distributing, or using any controlled substance; (2) manage or control

21  any place . . . either as an owner, lesee, agent, employee, occupant, or mortgagee, and

22  knowingly and intentionally rent, lease, profit from, or make available for use, with or

23  without compensation, the place for the purpose of unlawfully manufacturing, storing,

24  distributing or using a controlled substance."

25

26                      **ITEMS REGARDING NARCOTICS TRAFFICKING**

27         16.    Based on my training, experience, and participation in this investigation,

28  as well as numerous other investigations involving the manufacturing and trafficking of

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 7

1   large amounts of narcotics and my conversations with other experienced law

2   enforcement officers, I know the following facts, practices, and circumstances are

3   common to the manufacture and distribution of methamphetamine:

4           a.      Drug traffickers, including those who manufacture and distribute

5   methamphetamine, retain large amounts of U.S. currency in order to maintain and

6   finance their ongoing drug business, or as drug proceeds;

7           b.      Drug traffickers maintain books, records, receipts, notes, ledgers,

8   airline tickets, money orders, cashier check receipts and other papers related to the

9   transportation, ordering, sale and distribution of controlled substances, even though

10  such documents may be in code.  That drug traffickers commonly "front" drugs

11  (provide controlled substances on consignment) to their clients, and that records are

12  maintained by such dealers so they can account for their drug monies owed for these

13  illegal drugs.  That the aforementioned books, records, receipts, notes, ledgers and the

14  like are commonly maintained where drug traffickers have ready access to them,

15  including but not limited to homes, offices, automobile, and storage places;;

16          c.      It is common for drug dealers to secret contraband, proceeds of

17  drug sales and/or records of drug transactions, drug sources, and drug customers in

18  secure locations within their residences, businesses, offices, garages, storage buildings,

19  safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage

20  containers buried underground, in order to conceal such items from law enforcement

21  authorities;

22          d.      Persons involved in drug trafficking conceal caches of drugs, large

23  amounts of currency, financial instruments, precious metals, jewelry, and other items

24  of value and/or proceeds of drug transactions, and evidence of financial transactions

25  relating to obtaining, transferring, secreting, or spending of large sums of money made

26  from engaging in drug trafficking activities in their residences, businesses, offices,

27  garages, storage buildings, safes, vaults, safety deposit boxes, and/or automobiles;

28

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 8

1        e.     Drug traffickers commonly maintain addresses or telephone

2 numbers in books or papers which reflect names, addresses, and/or telephone numbers

3 for their associates in the drug trafficking organization, even if said items may be in

4 code, and that these types of records are sometimes maintained in computers or other

5 electronic data storage devices;

6        f.     Drug traffickers frequently take, or cause to be taken, photographs

7 and/or videos of themselves, their associates, their property, and their product, and that

8 these traffickers usually maintain these photographs and/or videos, in their residences,

9 offices, or other places under their control, and which are under the control of

10 unwitting persons;

11        g.     Drug traffickers often keep paraphernalia for packaging, cutting,

12 weighting, manufacturing and distributing controlled substances, and that such

13 paraphernalia often includes, but is not limited to scales, plastic wrap, plastic bags, and

14 aromatic substances such as soap, dryer sheets, wood shavings, heat sealers and plastic

15 wrapping that are used to mask odor of illegal drugs in an attempt to avoid detection by

16 drug detection dogs;

17        h.     It is common for drug dealers to deal/possess weapons, including

18 stolen weapons or other stolen goods and exchange drugs for such weapons or goods,

19 and these weapons are commonly used by drug dealers as an item of investment and for

20 protection from robberies by other drug dealers, and often are altered to fire fully

21 automatically;

22        i.     When drug dealers collect proceeds from the sale of illegal drugs,

23 they often attempt to legitimize these profits. Further, to accomplish this goal, drug

24 traffickers use sources, including but not limited to, foreign and domestic banks and

25 their attendant services, cashier's checks, money orders, wire transfers, and bank

26 drafts;

27        j.     Drug dealers commonly utilize telephones, both residential and

28 cellular, and pagers as means of communication to conduct their trafficking "business";

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 9

k.     Drug dealers often purchase expensive vehicles, businesses, and residences with the proceeds from their drug transactions, and that they often keep these items registered in the names of other trusted individuals in order to avoid discovery by law enforcement;

l.     With regard to the search of computers, I know that, for the following reasons, searching and seizing computer information from computers often requires agents to seize most or all of the electronic storage devices, along with the related peripherals, to be searched later by a qualified computer in a laboratory or other controlled environment:

i.     <u>Volume and Evidence</u> - Computer storage devices, including but not limited to, hard disks, floppy disks, diskettes, tapes, laser disks, and Bernoulli drives can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive files names. Therefore, searching authorities must examine all stored data to determine which files contain evidence of criminal activity. Depending on the volume of data stored, this sorting process may take several weeks or months, and it would be impractical to attempt this type of search on-site.

ii.     <u>Technical Requirements</u> - Searching computer systems for criminal evidence is a highly technical process requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires computer experts to specialize in distinct systems and applications, and it is difficult to know prior to a search which expert is qualified to analyze the particular computer system and its data that is encountered. In addition, since data search protocols are exacting scientific procedures designated to protect the integrity of the evidence and to recover "hidden," erased, compressed, password-protected, or encrypted files, and computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 10

1  codes imbedded in the system as a "booby trap"), a controlled environment is essential
2  to its complete and accurate analysis;

3     m.  There are many reasons why criminal offenders maintain evidence
4  for long periods of time.  The evidence may be innocuous at first glance (e.g. financial,
5  credit card and banking documents, travel documents, receipts, documents reflecting
6  purchases of assets, personal calendars, telephone and address directories, check books,
7  videotapes and photographs, utility records, ownership records, letters and notes, tax
8  returns and financial records, telephone and pager bills, keys to safe deposit boxes,
9  hardware and software computers), but have significance and relevance when
10  considered in light of other evidence.  The evidence may be highly valuable to the
11  offender, and at the same time be of usefulness for evidentiary purposes, such as
12  valuable investments (e.g. art, jewelry precious metals and stones, real estate,
13  securities), large sums of currency, drug or money laundering ledgers, safes, customer
14  lists, firearms, communications equipment, vehicles, airplanes, vessels, computers,
15  counter surveillance equipment, scales and packaging equipment.  The criminal
16  offender may no longer realize that he/she still possesses the evidence or believe that
17  law enforcement could obtain a search warrant to seize the evidence;

18     n.  In my experience as a drug investigator, I have found that illegal
19  drug trafficking is a continuing activity over months and even years.  Illegal drug
20  traffickers will repeatedly obtain or manufacture and then distribute controlled
21  substances on a somewhat regular basis, much as any distributor of a legitimate
22  commodity would purchase stock for sale, and similarly such drug traffickers will have
23  an "inventory" which will fluctuate in size depending upon the demand for the product.
24  Certain types of drug paraphernalia, such as scales for use in weighing amounts of
25  controlled drugs at the time of purchase, plastic wrap and plastic bags for packaging
26  drugs for distribution and/or transportation, are often kept by a trafficker on an
27  essentially continuous basis for use whenever needed.  Further, that traffickers keep
28  records of their illegal activities for months or years beyond the time during which they

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 11

1  actually possess illegal controlled substances, in order to maintain contact with their
2  criminal associates for future drug transactions, and so that they can have records of
3  prior transactions for which, for example they might still be owed money, or might
4  owe someone else money;

5          o.     Drug traffickers often maintain records of their illegal activities
6  and that those records are often kept in places that are readily accessible to them, such
7  as, but not limited to, the following:  homes, residences, garages, sheds, motorized
8  vehicles and vessels, enclosed trailers, storage lockers, and places of business or
9  employment.  This stored information is commonly kept for extended periods of time,
10  much as a legitimate business might keep records of purchases and distributions, and of
11  what is payable and/or receivable.  This is especially true when the chemical traffickers
12  and/or drug manufacturers activities include co-conspirators, large sums of money,
13  large amounts of drugs and/or chemicals, and have been carried out over an extended
14  period of time; and

15          p.     I am aware that in the case of drug traffickers, evidence is likely to
16  be found where drug dealers live, and a search warrant may be properly issued against
17  a suspected drug dealer's residence, despite the lack of direct evidence of criminal
18  activity at the residence.

19
20                    **FACTS SUPPORTING PROBABLE CAUSE**

21      17.    Members of the DEA and the PPB are investigating a methamphetamine
22  manufacturing and distribution organization which was operated by ROBERT JOHN
23  CAULFIELD, David Russell Brown, and Rodney Douglas Griffee.

24      18.    In September 1999, agents of the DEA, in conjunction with various local
25  and state law enforcement agencies began an investigation into the methamphetamine
26  distribution and manufacturing activities of Brown.  The investigation began when a
27  large clandestine methamphetamine laboratory was discovered as a result of a fire on
28  rural property owned by Brown:  21131 and 21151 Bridge Creek Road SE Silverton,

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 12

1  Oregon.  An analysis by the DEA Western Laboratory, of items seized from Brown's
2  property, confirmed that the laboratory was capable of producing multiple pound
3  quantities of methamphetamine.

4      19.    In December of 2003, a federal grand jury returned a sealed indictment
5  entitled United States v. David Russell Brown, CR No. 03-539-BR, for violations of
6  Title 21 United States Code Sections 853 and 856, Title 18 United States Code Sections
7  253 and 856 related to this clandestine methamphetamine laboratory for maintaining
8  premises where controlled substances are manufactured.

9      20.    On January 29, 2004, law enforcement officers arrested Brown on an
10 outstanding federal arrest warrant that was issued as a result of the investigation into
11 the crimes that occurred in 1999.  After Brown was arrested, law enforcement officers
12 served federal search warrants at his residence in Portland, Oregon, at a storage facility
13 where Brown had rented storage units and on Brown's vehicle.  Officers seized two
14 pounds of methamphetamine from Brown's residence, as well as approximately sixty
15 pounds of red phosphorus from a storage locker.  Officers also seized several pounds of
16 red phosphorus and an ounce of methamphetamine from Brown's vehicle.  I know from
17 my training and experience that red phosphorus is a necessary ingredient in
18 manufacturing methamphetamine.

19     21.    I obtained Brown's Oregon State Criminal History Record through the
20 LEDS system, which includes the period from 1980 to the present.  From this criminal
21 history, I learned that Brown was convicted in the State of Oregon, Clackamas County
22 Circuit Court for Manufacturing a Controlled Substance, and two counts of Possession
23 of a Controlled Substance in 1989.  He was also convicted of Hunting with Artificial
24 Light in 1983.

25     22.    Following his arrest and arraignment, Brown began cooperating with the
26 government pursuant to a proffer agreement, and later a plea agreement in the hope of
27 receiving a benefit for his cooperation.  Brown had pleaded guilty to a one count
28 Superseding Information in United States v. David Russell Brown, United States

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

1   District Court for the District of Oregon, Case No. CR 03-539-BR, charging him with

2   one count of Conspiracy to Distribute Methamphetamine. Brown's case is pending

3   sentencing.

4        23.    On March 4, 2004, TFA Braithwait and I spoke to Brown about his

5   knowledge of CAULFIELD'S involvement in the distribution and manufacturing

6   methamphetamine. Brown said that CAULFIELD, Griffee, and himself, all decided to

7   go into business together and they started manufacturing methamphetamine. Brown

8   said when they made the decision Brown was residing at 21131 and 21151 Bridge

9   Creek Road SE, Silverton, Oregon. (This is the same address previously mentioned in

10   above, where law enforcement officers discovered a large methamphetamine laboratory

11   following a fire.)

12        24.    Brown told me that a few years prior to the fire on his property in 1999,

13   CAULFIELD, Griffee, and Brown met and they agreed to manufacture and distribute

14   methamphetamine together. Brown explained that CAULFIELD would get fifty

15   percent of the manufactured methamphetamine and that Griffee and Brown would split

16   the other fifty percent of the drug. Brown stated that CAULFIELD could provide the

17   ephedrine/pseudoephedrine and Griffee would supply the iodine as well as distributing

18   Brown's portion of the methamphetamine. Brown said that he and CAULFIELD

19   manufactured the methamphetamine and Griffee would distribute Brown and Griffee's

20   share of the methamphetamine. CAULFIELD distributed his half of the

21   methamphetamine on his own. Brown said when they started manufacturing

22   methamphetamine, Brown and Griffee manufactured methamphetamine two or three

23   times on Brown's Silverton property. After the two or three occasions manufacturing

24   methamphetamine with Griffee, Brown began manufacturing the methamphetamine

25   with CAULFIELD instead of Griffee.

26        25.    Brown stated that he and CAULFIELD would normally manufacture four

27   pounds of methamphetamine twice a week. Brown said that he and CAULFIELD

28   shared the duties of manufacturing the methamphetamine. Brown stated that after the

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970) 553-7970

1   manufacturing process was complete, CAULFIELD would distribute eighteen to
2   twenty-one ounces of methamphetamine.  Brown said he would give his share of the
3   methamphetamine to GRIFFEE and he would distribute it for him.

4       26.    On March 8, 2004, Brown told TFA Braithwait and me that between 1997
5   and 1999, CAULFIELD brought his own chemicals that were used to manufacture
6   methamphetamine.  Brown said he would manufacture methamphetamine with
7   CAULFIELD and that they shared cooking vessels and glassware.  Brown said after the
8   manufacturing process was complete CAULFIELD took his share of the
9   methamphetamine - approximately eighteen to twenty-one ounces on each occasion.
10  Brown said CAULFIELD would distribute the methamphetamine without any
11  assistance from himself or Griffee.  Brown said he had traded precursor chemicals with
12  CAULFIELD when CAULFIELD had a supply of the chemical he needed.  BROWN
13  said he and CAULFIELD kept a running balance sheet between them and periodically
14  they would square the balance.

15      27.    Brown left the country shortly after the fire in 1999.  Brown said he
16  returned to the United States in the early months of 2000 and he met with
17  CAULFIELD again.  Brown said CAULFIELD, and a subject known as "Bobby"
18  manufactured large amounts of methamphetamine six different times at a house that is
19  located on the Lewis River, east of Woodland, Washington.  Brown described "Bobby"
20  as an American Indian from Tucson, Arizona.  Brown said they attempted to
21  manufacture twenty pounds of methamphetamine during each manufacturing process.
22  Brown said they yielded between ten to fifteen pounds of finished methamphetamine
23  after each process.  Brown said they valued the methamphetamine at $900.00 an ounce
24  and they would get between $144,000 and $216,000 for each batch.

25      28.    On March 11, 2004, TFA Len Braithwait and I showed Brown a
26  photograph of a residence located 4510 Old Lewis River Road, Woodland,
27  Washington.  BROWN stated that the residence in the photograph was the residence

28

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

1  where Brown, CAULFIELD, and "Bobby" cooked methamphetamine, starting in the
2  early part of 2000.

3      29.    TFA Braithwait and I showed Brown a photograph of the same residence
4  that was taken from a different vantage. BROWN identified this photograph as being
5  the same residence. BROWN pointed out the windows in the area above the garage
6  and explained that behind the window are regular curtains and then each window is
7  covered on the inside with either black or semi-clear plastic.

8      30.    Brown said CAULFIELD was responsible for the payment of the storage
9  area that is located above the garage. Brown said CAULFIELD would pay the owner
10 with both cash and methamphetamine. Brown did not remember the property owner's
11 name. Brown said CAULFIELD would store waste and remnants from the
12 methamphetamine manufacturing above the garage. Brown said CAULFIELD would
13 attempt to re-manufacture the waste in an attempt to obtain addition methamphetamine.
14 Brown said he and CAULFIELD usually had three cooking vessels operating during the
15 manufacturing process. Brown said two of the cooking vessels were his and one vessel
16 belonged to CAULFIELD. Brown said on one occasion CAULFIELD brought
17 "Bobby" to the manufacturing location so he could do CAULFIELD'S share of the
18 physical labor. Brown said CAULFIELD was lazy. Brown said he and CAULFIELD
19 were fifty-fifty partners in the methamphetamine manufacturing process and they would
20 split the product in half between them.

21     31.    Brown told me that the property owner was present at different occasions
22 during the manufacturing process. Brown said the property owner was anxious for the
23 process to be complete so he would get his portion of the methamphetamine. Brown
24 said the property owner was given an extra ounce of methamphetamine if the
25 pseudoephedrine pills were crushed and pulled from the binder on his property. Brown
26 said the last time he and CAULFIELD manufactured methamphetamine at the Old
27 Lewis River address was in October or November of 2002.

28

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE S220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

32.    TFA Braithwait and I showed Brown a photograph of a residence located at 4390 Old Lewis River Road, Woodland, Washington. Brown identified this residence as the rental house that CAULFIELD and his wife, Cindy lived in from the early months of 2000 to October or November 2002. Brown said this was the same time period that they were manufacturing methamphetamine.

33.    Brown told me that after Brown and CAULFIELD manufactured methamphetamine for the last time (around December 2002) on the Old Lewis River property, Brown and CAULFIELD met about every six weeks so they conduct methamphetamine business. Brown said they would meet at either Damon's Restaurant or Waddles Restaurant, which are both located on Hayden Island, in Portland, Oregon. During some of the meetings they would discuss money that CAULFIELD owed Brown, during other meetings the two men exchanged either methamphetamine, or chemicals that were going to be used to manufacture methamphetamine. Brown said he and CAULFIELD would use the coded words "the rib place" in speaking on the telephone to arrange a meeting at Damon's restaurant and that they would use the coded words "the duck place" for a meeting at Waddle's Restaurant.

34.    On September 16, 2003, Portland Police DVD Officer Justin Faw and I observed a meeting between CAULFIELD and Brown at Damon's Restaurant located on Hayden Island, Portland, Oregon.

35.    On March 31, 2004, TFA Braithwait and I interviewed Janet Moe and Rodney Foresberg of 4510 Old Lewis River Road. Janet Moe and Rodney Foresberg are the landlords of 4390 Old Lewis River Road. Foresberg told us that two or three years ago CAULFIELD asked him if he could use his property to cook methamphetamine. Foresberg told us that for usage of his loft in his residence he would receive $3,000.00 and 1/2 ounce of methamphetamine as payment. On July 22, 2004, TFA Braithwait acquired the rental agreement between Moe and CAULFIELD for the rental of 4390 Old Lewis River Road.

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

36.     On January 29, 2004, law enforcement officers arrested Griffee on an outstanding federal arrest warrant for three sales of methamphetamine that occurred in 2001.  Following his arrest, Griffee began cooperating with the government pursuant to a proffer agreement and later a plea agreement in the hope of receiving a benefit for his cooperation.  Griffee pled guilty to on count of Distribution of five grams or more of Methamphetamine in <u>United States v. Rodney Douglas Griffee</u>, United States District Court for the District of Oregon, Case No. CR 03-564-HA.  This case is pending sentencing.

37.     I obtained Griffee's Federal Bureau of Investigation record through the LEDS system and learned from that record that in 1994 Rodney Douglas Griffee was convicted in United States District Court for Attempting to Manufacture Methamphetamine in violation of Title 21 United States Code Sections 841 and 846, and was sentenced to 57 months prison to be followed by five years supervised release. I obtained Rodney Douglas Griffee's criminal history from the Oregon State Police through the LEDS system, which includes the period from 1980 to the present.  From this criminal history I learned that Rodney Douglas Griffee has been convicted in the State of Oregon of the following felonies: Possession of a Controlled Substance in 1987, Felon in Possession of a Weapon in 1987, Theft I in 1985, Forgery I in 1985, two counts of Theft I in 1982.  He was also convicted of misdemeanor Failure to Appear II and Failure to Pay Fine in 1980.

38.     On May 4, 2004, TFA Braithwait and I spoke to Griffee.  Griffee said at least one year prior the 1999 fire at the Bridge Creek, Silverton, Oregon property, he was approached by Brown to manufacture methamphetamine.  Griffee said Brown wanted Griffee to teach Brown the red-phosphorous method of producing methamphetamine, Griffee said Brown was willing to pay Griffee $20,000 for his teaching services.  Griffee stated that he introduced CAULFIELD to Brown and that CAULFIELD is a methamphetamine cook.  Griffee stated that CAULFIELD had expertise in drying methamphetamine during its final stage of production.  Griffee said

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 18

1 | that Brown, CAULFIELD, and Griffee manufactured ten pounds of methamphetamine
2 | about every two weeks. Griffee said they used the red-phosphorous method to
3 | manufacture the methamphetamine. Griffee said they manufactured on the Silverton,
4 | Oregon property until the fire occurred on September 16, 1999.

5 |     39.   On April 13, 2004, other agents and I identified the residence located at
6 | 749 Taylor Road, Kalama, Washington as the residence where CAULFIELD lived until
7 | December 10, 2004. I also identified vehicles used by CAULFIELD as a 1979 Chevy
8 | Pickup, bearing Washington plates A56020E ("Chevy Pickup") and a large yellow 1990
9 | Ford van/truck bearing Washington plates A21529E ("Ford Van/Truck"). Other
10 | officers and I saw CAULFIELD driving a Chevy Pickup on multiple occasions
11 | following June, 2004. Portland Police Officer Justin Faw saw CAULFIELD driving
12 | the Ford Van/Truck on December 10, 2004. I ran an NCIC/LEDS check on the Chevy
13 | Pickup and learned that the registered owner is Lanny R. Moore, 13904 NE 64th
14 | Circle, Vancouver, Washington. I ran an NCIC/LEDS check on the Ford Van/Truck
15 | and learned that the vehicle is registered to CAULFIELD'S wife Cindy CAULFIELD,
16 | under her maiden name Rasmussen.

17 |     40.   On December 10, 2004, Portland Police Officer Justin Faw observed
18 | CAULFIELD moving out of his residence at 749 Taylor Road, Kalama, Washington.
19 | Officer Faw observed CAULFIELD moving all of his household goods, including
20 | furniture, refrigerator, personal items his Ford Van/Truck to 129 Vincent Road,
21 | Kalama, Washington. Officer Faw observed CAULFIELD make several trips from
22 | 749 Taylor Road to 129 Vincent Road. Some of the items moved were in
23 | CAULFIELD'S Chevy Pickup and other items were moved in a rental U-Haul truck.
24 | Officer Faw observed that no stops were made traveling from 749 Taylor Road,
25 | Kalama, Washington to 129 Vincent Road, Kalama, Washington. Officer Faw
26 | observed that the trucks stayed at 129 Vincent Road for several hours before traveling
27 | back to 749 Taylor Road. I believe based on Officer Faw's observations that
28 | CAULFIELD stored his household goods and personal belongings on the property of

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 19

1  129 Vincent Road in one or more of the outbuildings.  Due to the extreme rural
2  location of 129 Vincent Road it was difficult for surveillance to identify which of the
3  three outbuildings on 129 Vincent Road CAULFIELD uses to store his household
4  goods.  Between December 10, 2004 and the date of this affidavit, CAULFIELD'S
5  yellow truck has been parked at 129 Vincent Road, Kalama, Washington and agents
6  have not observed CAULFIELD move any of the household goods from that location.
7  I received landowner records on the property and learned that Bruce and Betty Wright
8  are the legal owners of 129 Vincent Road and that Earl Wright is paying the electric
9  bill.

10        41.    On December 11, 2004, I went to the Kalama School District and learned
11  that CAULFIELD told the school administrators he was moving to 1055 Cloverdale
12  Road, Kalama, Washington and that his son Levi Caulfield would need to be dropped
13  off by the school bus at 1055 Cloverdale Road, Kalama, Washington, after school.  On
14  January 7, 2005, I followed a Kalama school bus to 1055 Cloverdale Road and
15  observed Levi Caulfield getting off the bus and walking towards the 1055 Cloverdale
16  Road address.   Since December 11, 2004, other agents and I have observed
17  CAULFIELD'S Chevy Pickup and CAULFIELD at 1055 Cloverdale Road.  I have
18  learned through record checks that the property is owned by and utilities are paid by
19  Daniel E. Veberes.  Other officers and I have observed CAULFIELD'S Chevy Pickup
20  parked at this residence in the early morning hours and late evening hours since from
21  December 10, 2004 through February 16, 2005.  To the best of my knowledge, the
22  Chevy Pickup remains parked in the same location.  I have observed the CAULFIELD
23  and his vehicle at this residence for extended periods of time.

24        42.    In January 2005, CAULFIELD was indicted by a federal Grand Jury in
25  the District of Oregon for Conspiracy to Manufacture Methamphetamine in a sealed
26  indictment.  I know from reviewing CAULFIELD'S Federal Bureau of Investigation
27  record through the LEDS system that CAULFIELD was convicted in Marion County in
28  1977 for criminal activity drugs, has been arrested twice for narcotic related offenses,

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

1   and had two counts dismissed in 1996 for controlled substance offense and possession

2   of firearm.

3       43.     I have been involved with numerous search warrants executed for the

4   seizure of documents, records, and/or proceeds of the sale of drugs.   In almost all

5   cases the search warrants have resulted in the seizure of drugs, records, and/or records

6   of assets acquired from the sale of controlled substances.  Also in my training and

7   experience I have become aware that the actions of narcotics traffickers, money

8   laundering violators, and their associates, it is necessary to search for and to seize

9   records that disclose the accumulation, disposition, and secreting of the proceeds and

10  profits derived from the sale of controlled substances.

11

12                              **CONCLUSION**

13      44.     Based upon all of the information set forth in this application, I

14  respectfully submit that there is probable cause to believe that the instrumentalities,

15  fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1),

16  846, and 856 are present at or in the following locations and vehicles:  (a)1055

17  Cloverdale Road, Kalama, Washington; (b) 129 Vincent Road, Kalama, Washington;

18  (c) 1979 Red Chevrolet Pickup, Washington License A56020E, VIN/CCD146J152903;

19  and (d) 1990 Yellow Ford Van/Truck, Washington License A21529E,

20  VIN/1FDKE37G5LHB21297, as further described in Attachment A, which is attached

21  hereto and incorporated herein by reference.

22      45.     In consideration of the foregoing, I respectfully request that this Court

23  issue an order authorizing the search of the following locations, as more specifically

24  described in Attachment A, which is attached hereto and incorporated herein by

25  reference:

26          a.      1055 Cloverdale Road, Kalama, Washington; and

27          b.      129 Vincent Road, Kalama, Washington,

28

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970) 553-7970

1  for the items, materials and records more specifically identified and described in

2  Attachment B, which is attached hereto and incorporated herein by reference.

3       46.    In consideration of the foregoing, I respectfully request that this Court

4  issue an order authorizing the search of the following vehicles, as more specifically

5  described in Attachment A, which is attached hereto and incorporated herein by

6  reference:

7       a.    1979 Red Chevrolet Pickup, Washington License A56020E,

8  VIN/CCD146J152903;

9       b.    1990 Yellow Ford Van/Truck, Washington License A21529E,

10  VIN/1FDKE37G5LHB21297,

11  for the items, materials and records more specifically identified and described in

12  Attachment B, which is attached hereto and incorporated herein by reference.

13

14

15

16  _____
    ROBERT J. ALLEN, Special Agent
    Drug Enforcement Administration

17

18  Subscribed to and Sworn to before me this _17_ day of February, 2005.

19

20

21  _____
    GILBERT H. KLEWENO
22      United States Magistrate Judge

23

24

25

26

27

28

AFFIDAVIT OF SPECIAL AGENT
ROBERT ALLEN - 22

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

**1.   1055 CLOVERDALE ROAD, KALAMA, WASHINGTON**

1055 CLOVERDALE ROAD, KALAMA, WASHINGTON is described as a residential two story, wood framed, dwelling, brown in color, with white trim.  The dwelling is located on a multi acre parcel of property, west of Cloverdale Road and is accessed by a dirt road.   The property contains one large outbuilding/pole barn/garage south and east of the residence that is gray in color with a tin roof and is further referenced by attached photograph.



**2.   THREE OUTBUILDINGS LOCATED ON THE REAL PROPERTY AT 129 VINCENT ROAD, KALAMA, WASHINGTON**

THREE OUTBUILDINGS LOCATED ON THE REAL PROPERTY AT 129 VINCENT ROAD, KALAMA, WASHINGTON are described three outbuildings located in close proximity to each other and are further described as: 1) the northern most outbuilding is blue metal building with a white roof and no windows; 2) the second outbuilding is gray/white in color with a white roof, the front door is red and no windows; 3) the third outbuilding is a small brown wooden building with a tin roof and no windows.  All three out buildings are located south of Vincent Road, east of a private easement road which accesses several other private parcels and residences.  The front doors to all three

1

outbuildings face west and are further referenced by attached
photograph.



3.    1979 Red Chevrolet Pickup, Washington License A56020E,
VIN/CCD146J152903 further described by attached photographs.





4.    1990 Yellow Ford Van/Truck, Washington License A21529E,
VIN/1FDKE37G5LHB21297



2

## ATTACHMENT B

The following records, documents, and other items, in whatever form, that constitute instrumentalities, fruits, and evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856:

(a)    Controlled substance ledgers, or money ledgers, controlled substance distribution lists or customer lists, controlled substance supplier lists, correspondence, notations, logs, receipts, journals, books, ledgers or other documents noting the price, quantity and/or times when controlled substances were obtained, transferred, sold, distributed and/or concealed;

(b)    Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, personal notes and other items reflecting names, addresses, telephone numbers, communications, bank records, wire transfer receipts and illegal activities of associates in drug trafficking activities;

(c)    Indicia of occupancy, residency or ownership of the premises and things described in this warrant, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements and escrow documents;

(d)    Records, items and documents reflecting travel for the purpose of participation in controlled substance trafficking including passports, airline tickets, credit card receipts, travel vouchers, motel/hotel receipts, rental car receipts and documentation, wire transfer receipts, maps and written directions to locations;

(e)    Financial/Drug records, including but not limited to, books, records and documents used, intended for use, or concerning manufacturing and distribution of methamphetamine, and association with others involved in the manufacturing and distribution of methamphetamine, or facilitation of the transportation, sale, receipt, possession of concealment of methamphetamine, to include, but not limited to writings, photographs, calendars, "Things to do" schedules, and similar items;

(f)    Hand written notes concerning prices, quantities, sales, loans, "pay and owe" records indicating sales and balances owed for methamphetamine sales, or any other account books, ledgers and notes relating to above individuals drug trafficking activities, in any form; typed instructions regarding any of the above; encoded and/or cryptic information whether in writing or contained within pagers, cellular telephones,

ATTACHMENT B -1

computers/computer tapes and disks, together with hardware and software, instruction manuals to allow interpretation and retrieval of information stored therein, as well as the computer themselves, word processors or similar equipment containing information concerning methamphetamine distribution, or association with those involved in methamphetamine distribution, to include computers, floppy disks, back up disks, software instruction, and the computers, word processors or other similar equipment itself, together with any software used to operate said equipment;

(g)   Correspondence and envelopes, personal telephone and address books, together with telephone toll records, travel records, receipts, airline tickets, and auto rental agreements, invoices and other memorandum disclosing acquisition of assets, both personal and business in nature, retained copies of financial statements, loan records, mortgages, deeds, titles, certificates of ownership and registration documents, state and federal income tax returns, both individual and corporate; any stored information contained on any telephone answering machine/tape(s)pertaining to any of the above, as well as documentary evidence indicating past, present, or intended possession of methamphetamine or any equipment described in this exhibit;

(h)   Storage locker contracts, keys, codes, and associated documentation; together with any other evidence of narcotics profits and/or proceeds, and items purchased with proceeds, such as U.S. currency, coins, gems, financial and negotiable instruments, securities, precious metals, jewelry, vehicle registration receipts; as well as other items of identification such as vehicle registrations, vehicle titles, driver licenses, letters, bills, receipts, fingerprints, property titles, records relating to obtaining, transferring, secreting or spending money to include bank account records, including checking, savings, and investments accounts, safe deposit box keys and rental applications and signature cards, stocks, bonds, financial accounts, airline tickets, boats, vehicles and other items of value as well as evidence regarding the concealment of the source and ownership of such cash, proceeds and items of value by use of false names, aliases, postal box addresses, addresses of relatives and acquaintances, corporations and other devices as well as records, receipts, notes, identification documents and other papers indicating that the persons named above are presently using aliases or assumed names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities;

(i)   Scales, cutting materials, baggies, and other packaging materials; and

(j)   Large quantities of cash.

ATTACHMENT B-2